IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 13 CR 878-1 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| DAVID CARTER | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant David Carter's motion to suppress evidence of his purported statement [23]. For the reasons set forth below, the Court denies Defendant's motion.

**I.  Background**

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe"). In this case, the Court conducted a suppression hearing on October 2, 2014, during which counsel for the Government presented the testimony of Dr. Steve Herrin, a staff psychiatrist at Edward Hines, Jr. Veterans Administration Hospital ("Hines"), and Special Agent Sean Burke, and counsel for Defendant presented the testimony of Deputy U.S. Marshall Troy Brejc and VA Police Captain Cary Kolbe. After considering the testimony of the witnesses and assessing their opportunity to observe and hear the events as they unfolded, as well as their credibility, the Court sets forth the following

1

recitation of the facts surrounding the encounter between Defendant and federal agents that gave rise to the motion to suppress currently before the Court.

According to Defendant David Carter, he has a lifelong history of homelessness and a lengthy, well-documented history of alcoholism. In 2008, Carter was charged with robbing the Community Bank located on West 35th Street in Chicago, and, in 2010, he was sentenced to 77 months in prison. Prior to June 12, 2013, Carter was released to a Salvation Army halfway house to serve the remainder of his sentence. He was permitted to leave during the day, but had a nightly curfew. On June 12, 2013, the halfway house notified the United States Marshals that Carter did not return at curfew. At that point, the United States Marshal Service issued an arrest warrant for Carter, alleging that Carter had escaped from the halfway house. The Marshal Service also notified the FBI's Violent Crimes Task Force of Carter's escape.

On October 30, 2013, David Carter was charged in a two-count indictment with (1) escaping the halfway house in violation of 18 U.S.C. § 751(a) (Count One) and (2) attempted bank robbery in violation of 18 U.S.C. § 2113(a) (Count Two). The indictment alleges that on June 14, 2013, 2 days after he failed to return for curfew, Carter robbed the Community Bank again. According to the indictment, at approximately 1:45 p.m. on June 14, Carter entered the bank and approached an area staffed by two bank employees. Carter who allegedly was slurring his words and struggling to stand upright, told one of the bank employees that he had forgotten something at home. Carter then left the bank and returned approximately 10 minutes later. At that point, he allegedly handed an employee a crinkled piece of paper that said, "I NEED $20,000 OR I WILL SHOOT YOU." The employee told Carter that they did not keep money in her area of the bank, and Carter responded, "Okay, okay," and then walked out of the bank.

Following the robbery attempt, on June 16, Carter allegedly was taken via ambulance to a hospital where doctors determined that he was suffering from suicidal ideations and depression and was severely intoxicated.[1] He then voluntarily checked himself into Hines, was admitted to the psychiatric ward ("2 South") at Hines, a "lockdown" section of the hospital, and was treated for depression and alcoholism.[2] When an individual is in the lockdown section, he or she cannot leave unless medically cleared to do so. Because Carter was a voluntary patient, he could have requested release, but he still would have needed to be medically cleared by the staff prior to discharge.

At the suppression hearing, Dr. Herrin, a staff psychiatrist at Hines, testified that he examined Carter first on June 17 and again on June 18. Prior to Dr. Herrin's first examination, Carter had been prescribed and was taking two medications: 100 mg of trazodone (a sedating anti-depressant prescribed as a sleep aid) and 100 mg of Wellbutrin (a non-sedating anti-depressant) twice a day. According to Dr. Herrin, Carter told him that the trazodone made him sleepy or "groggy," which Carter did not like, so following his examination on June 17, Dr. Herrin decreased the dosage from 100mg to 50mg and told Carter to take trazodone only as necessary. Carter did not take the sleep medication on the night of June 17. Dr. Herrin further testified that 100 mg of Wellbutrin was below the recommended therapeutic dosage of 150 mg twice a day, but he wanted to see how Carter tolerated the drug before increasing his dosage to 150 mg.[3] According to Dr. Herrin, the dose of Wellbutrin that Carter was taking would not cause incoherence, difficulty speaking or understanding English, or cognition problems. Dr.

---

[1] Carter's blood alcohol level was .20.

[2] At the time he was admitted to the Hines psychiatric ward, he was still being monitored for suicidal ideations, but none were observed and so the focus was on treatment for depression and alcoholism.

[3] At some point following Carter's interview with FBI agents, his dosage of Wellbutrin was increased from 100mg to 150 mg, twice a day.

Herrin testified that potential side effects of Wellbutrin include overstimulation, insomnia, and anxiety.

Dr. Herrin also examined Carter on the morning of June 18. Carter was sober and not exhibiting any notable side effects from the medication. Dr. Herrin testified that Carter was pleasant and cooperative, but still very depressed, and noted that while Carter was not having suicidal ideations at this point, he still was having passive suicidal thoughts. A test also was administered to measure Carter's orientation and sensorium. Carter was uncertain as to the date and also could not correctly answer certain math addition problems. Despite these lapses, at the time of the examination on June 18, Dr. Herrin found Carter to be coherent and able to comprehend and answer questions.

As a result of his failure to return to the halfway house, there was an outstanding arrest warrant for Carter. FBI agents located Carter at Hines four days after the robbery; as previously indicated, he had been there since June 16, 2013. On June 18, FBI Agent Sean Burke confirmed that Carter was located at Hines and he and another agent went to Hines to speak with Carter.[4] Carter was brought from the 2S to a first floor interview room around 11:30 a.m. Prior to questioning Carter, the agents secured a written waiver of Carter's *Miranda* rights on an "Advice of Rights" form. The agents gave Carter the form and asked him to read the first two lines of the form out loud and the remainder to himself. The agents did not tell Carter the purpose of their visit—to question him about the attempted bank robbery—prior to obtaining his signature on the Advice of Rights form. The interview lasted approximately 20-25 minutes.

---

[4] Agent Burke testified that he initially hoped to take custody of Carter on June 18, 2013. However, the testimony at the hearing, as well as Agent Burke's report, reflects that VA Police Captain Kolbe (at the time a lieutenant) advised the agents on June 18 that Carter was not free to leave the facility either on Carter's own accord or in law enforcement custody because he had not yet been medically cleared to do so.

According to Agent Burke's testimony at the hearing, the tone of the interview was "respectful" and "cordial" on both sides.[5] Burke testified that Carter admitted to being depressed and on medication, but he also noted that Carter spoke clearly and logically, appeared sober, and answered questions coherently. Carter did not request that an attorney be present. Carter admitted to the agents that he fled the Salvation Army halfway house on June 12. He said that he started drinking heavily after fleeing and had slept in a vacant lot near the bank on the night of June 13. He said that he did not have a recollection of June 14, the day of the robbery, other than drinking heavily. Agents also showed Carter surveillance photographs from the robbery. During the suppression hearing, FBI Agent Sean Burke testified that Carter identified himself as the individual depicted in two photos.

At the end of the interview, Carter consented to the seizure of the clothing that he was wearing when he checked into the hospital. He also gave permission for a treating physician to provide medical information to the agents. Following the interview, the agents spoke with one of Carter's physicians, who identified which medications and vitamins Carter was taking and also stated that those medications would not have a negative effect on Carter's ability to participate in an interview.

Carter was medically cleared for release on June 21, 2013, at which point he was arrested.

Carter represents to the Court that he anticipates going to trial on the attempted bank robbery charge, but will enter a plea of guilty to escape as charged in Count One of the indictment, pursuant to a written plea declaration.

---

[5] Deputy United States Marshal Troy Brejc, who had the warrant for Carter's arrest, also was present for portions of Carter's interview. According to Deputy Brejc, the interview was cordial and Carter appeared coherent and able to answer questions appropriately.

**II.     Analysis**

For a criminal defendant's post-arrest statement to be admitted into evidence against him during a criminal trial, the government must be able to demonstrate by a preponderance of the evidence that the defendant waived his *Miranda* rights before making the statement. *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010). A defendant may waive his *Miranda* rights "only if that waiver was made 'voluntarily, knowingly and intelligently.'" *United States v. Carson*, 582 F.3d 827, 833 (7th Cir. 2009) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). More specifically, the waiver inquiry "has two distinct dimensions." *Burbine*, 475 U.S. at 421. A waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Additionally, a waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

In determining whether a defendant waived his *Miranda* rights "voluntarily, knowingly and intelligently," courts evaluate the "totality of the circumstances" surrounding the waiver.[6] *Burbine*, 475 U.S. at 421. The Seventh Circuit has identified a number of factors relevant to this inquiry, including "the nature and duration of the questioning, whether the defendant was prevented from eating or sleeping, and whether the defendant was under the influence of drugs or alcohol." *Watson v. Detella*, 122 F.3d 450, 453 (7th Cir. 1997). Courts also consider "the defendant's age, intelligence, education, and experience with the criminal justice system." *Id.* According to the Seventh Circuit, "absent a showing of some type of official coercion * * * a defendant's personal characteristics alone are insufficient to render a confession involuntary."

---

[6] Although whether a defendant made a knowing and voluntary waiver of his Miranda rights is a separate inquiry from a claim challenging the voluntariness of a confession, *Etherly v. Davis*, 619 F.3d 654, 662 (7th Cir. 2010), "in evaluating whether a [defendant] voluntarily waived [her] Miranda rights, [courts] consider the same factors * * * consider[ed] * * * in assessing the overall voluntariness of a confession." *Ruvalcaba v. Chandler*, 416 F.3d 555, 562 (7th Cir. 2005).

*Id.* That said, "[w]hen interrogating officers should reasonably have known that a suspect was under the influence of drugs, or alcohol, 'a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991). Courts generally will hold that a defendant's waiver is knowing and intelligent if he "understands that he can refuse to talk to the people asking him questions or stop the questioning once it begins; that the people asking him questions are not his friends but are police or law enforcement personnel who are trying to show he is guilty of a crime; that he can ask for and get a lawyer who will help him; and that he does not have to pay for that lawyer." *Collins v. Gaetz*, 612 F.3d 574, 588 (7th Cir. 2010). "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the Miranda warnings that the courts have found an unintelligent waiver." *Id.*

At the time of the interview, Carter was a 54-year-old patient in the psychiatric ward at Hines Hospital as a result of alcohol abuse, depression, and passive suicidal thoughts. Prior to his arrival at Hines, he has been convicted approximately one dozen times and arrested numerous other times and thus he was familiar with the criminal justice system. He could read and write English. Moreover, the interview with the agents was not lengthy and, by all accounts, was cordial and respectful. Furthermore, there is no evidence that the agents used coercive tactics during the interview.

Prior to entering the hospital, Carter had been sleeping on the streets for approximately four days; however, on the morning of his interview, Carter had spent the previous two nights at the hospital. See *United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001) (considering the totality of the circumstances and noting that the defendant's lack of sleep did not result in invalid *Miranda* waiver). According to his treating psychiatrist, Carter was sober and not exhibiting any

7

notable side effects from the two medications that he was taking. *Id.* (considering the defendant's behavior, not just the fact that the defendant was taking medication, in assessing whether the defendant's medication influenced her waiver of rights). He was taking two medications (Wellbutrin and trazodone), but had only taken Wellbutrin in the 24 hours leading up to the interview. The psychiatrist also testified that while Carter still was very depressed and had not been able to identify the date during a test that morning, Carter had been coherent, orientated, pleasant, and cooperative and Dr. Herrin did not think that his withdrawal from alcohol use or state of mind that day would have prevented him from understanding and answering questions from the agents. See *United States v. Walker*, 272 F.3d 407, 412-414 (7th Cir. 2001) (upholding the voluntariness of a confession where a defendant was going through heroin withdrawal but officers and emergency room physician testified that the defendant was alert and coherent, albeit in pain); *id.* (noting that the "key point * * * is that a suspect's physical pain or drug use does not make a confession involuntary as a matter of law"); see also *United States v. Washington*, 99 Fed. Appx. 750, 751 (7th Cir. 2004) (concluding that there was no evidence that the defendant's "will or understanding were impaired by the pain of his wound or the effect of painkillers"); *United States v. Khalil*, 214 F.3d 111, 121-122 (2d Cir. 2000) (statements made by defendant as he was being prepared for "live-saving surgery on his leg" were knowing and voluntary); *United States v. Morris,* 287 F.3d 985, 989 (10th Cir. 2002) (rejecting gunshot victim's claim of FBI coercion where FBI took care in determining whether victim's medical condition would impair his ability to answer questions); *United States v. Hack,* 782 F.2d 862, 866 (10th Cir. 1986) (concluding that statements made two days after gunshot wound to defendant's mouth while defendant was still in pain were voluntary).

In short, Carter's background and conduct during the interview, the duration of the interview, the testimony of his treating psychiatrist (who found him to be sober and coherent on the morning of the interview), and the attitude and conduct of the agents during the interview all point to a knowing and voluntary waiver. See *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009). That leaves the fact that Defendant was depressed and admitted to the psychiatric ward at Hines at the time of the interview, which certainly is the most persuasive countervailing point that he raises. But Defendant has not presented, nor has the Court found, any authority that holds that the mere fact that a defendant is admitted to a hospital or psychiatric ward for depression or detoxification renders his confession involuntary. Rather, Supreme Court case law indicates that a "defendant's mental condition, by itself and apart from its relation to official coercion" is not dispositive "of the inquiry into constitutional voluntariness." *Colorado v. Connelly,* 479 U.S. 157, 164 (1986) (citing *Spano v. New York,* 369 U.S. 315 (1959) (internal quotation marks omitted); *United States v. Kelley,* 953 F.2d 562, 564 (9th Cir. 1992) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973) (writing that courts examine "both the characteristics of the accused and the details of the interrogation" when inquiring into voluntariness)). In the absence of coercion, mental and emotional instability do not render a coherent and alert defendant's custodial *Miranda* waiver and voluntary statements to law enforcement officers inadmissible. See, *e.g., United States v. Marquez–Lerma,* 203 Fed. Appx. 1 (9th Cir. 2006) (affirming denial of a motion to suppress statements on claim that the defendant's depressed emotional state prevented him from making a knowing and intelligent waiver of his rights where officers "testified that defendant was 'coherent' and 'reasonable' and that they had no reason to suspect that his Miranda waiver was not knowing and intelligent."); *United States v. Ritter,* 456 F.2d 178, 179 (10th Cir. 1972) (denying motion to suppress and reasoning that

defendant's "claims of instability, employment difficulties, psychiatric treatment, fear of policemen and being tired and hungry will not serve to overcome confessions given after proper *Miranda* warnings with no evidence of force, threats or promises being used to obtain the confessions."); *United States v. Gordon*, 638 F. Supp. 1120, 1135-1149 (W.D. La. 1986) (holding that the defendant's psychological problems, including depression, dependent personality disorder, posttraumatic stress syndrome, and battered woman syndrome, did not render her waiver of *Miranda* rights or subsequent statements involuntary) (affirmed by 812 F.3d 965 (5th Cir. 1987)); see also *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985) (affirming district court's conclusion that depression was a natural consequence of being caught and that neither depression nor rough treatment by police at the arrest rendered subsequent statements involuntary). Instead, it all goes back to the totality of circumstances, which, in this case, generally point to a voluntary, knowing, and intelligent waiver upon signing the "Advice of Rights" form. See *Connelly,* 479 U.S. at 167 (concluding that a defendant's emotional or mental instability must be coupled with coercive police activity to find that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment); see also *Walker*, 272 F.3d at 412-414; *Washington*, 99 Fed. Appx. at 751.

In sum, a court must look at the totality of the circumstances, and here, the evidence presented shows that Carter, a 54-year old man who could read and understand English and who had several prior felony convictions, had no difficulty understanding the waiver and its implications. In addition, Carter's treating psychiatrist testified about his mental acuity and condition and concluded that he was able to understand and answer questions. Thus, the Court concludes, based on facts presented during the suppression hearing, that Carter's status as a patient in the Hines psychiatric ward, his medications, and any lingering withdrawal symptoms

did not negate his ability to knowingly or intelligently waive his rights as evidenced by the undisputed testimony during the suppression hearing by Dr. Herrin and Agent Burke that Carter was lucid, oriented, coherent, sober, in grasp of his facilities, and able to understand and answer the questions posed to him.

With that said (and decided), these circumstances pose the question previously noted on occasion by the Seventh Circuit concerning whether the agents could have handled this situation in a way that could have obviated the need for this analysis. See *Walker*, 272 F.3d 407, 413 (7th Cir. 2001) ("Nonetheless, it does seem to us that the government could have handled this in a way that would have obviated the need for such fine line drawing. It offers no reason why it could not have waited the 24 to 48 hours that, according to the physician, it would have taken for Walker to be through the most painful hours of withdrawal. There could be a case in which a suspect's vulnerable physical condition rendered anything he said involuntary."). In its written submissions and during the hearing, the Government offered no compelling reason why it could not have waited until Carter was medically cleared for release to question him; indeed, he was not going anywhere, as the agents and deputy marshal had conveyed to Hines personnel that they had a warrant for his arrest.[7] The Court already has decided that the totality of circumstances in this case render Carter's statements intelligent, knowing, and voluntary. However, in deciding to proceed with the interview before speaking with his doctor, the Government may have run the unnecessary risk of confronting a "suspect's vulnerable physical condition" (*id.*): that is, that Carter's stint in a psychiatric ward, coupled with the medication he was taking and his depression and suicidal thoughts, rendered his statements involuntary and thus inadmissible. As the Seventh Circuit suggested in *Walker*, scenarios exist in which a defendant's background,

---

[7] The agents also waited until the interview was concluded before speaking with his treating physician about his mental state and medications.

medication, and fragile state, as well as the tactics used during an interview, could render a statement made while in the custody of a psychiatric ward involuntary. However, here, the evidence—his signed waiver, the treating psychiatrist's testimony regarding his mental state and medications, the agent's testimony about the interview and defendant's demeanor, the agents' non-coercive conduct, and the fact that Carter had been at Hines for two days and was more rested, sober, and coherent than when he arrived—comports with a knowing, voluntary, and intelligent waiver. On these facts, Defendant's motion to suppress is denied.

## III. Conclusion

For these reasons, the Court denies Defendant David Carter's motion to suppress evidence of his purported statement [23].

Dated: October 7, 2014

_____
Robert M. Dow, Jr.
United States District Judge